Your Honors, I'd like to reserve, or endeavor to reserve, three minutes for a rebuttal. Good morning, Your Honors. May it please the Court, my name is Robert Popper, and I represent the appellants. Your Honor, the appellants obtained an injunction from the United States Supreme Court under possibly the highest legal standard known to law. And following the grant of that injunction, the defendants undid all of the elections that were the subject of the filing of the plaintiff's complaint in the first place. The case was ultimately determined to be moot because of that, and in those circumstances, the plaintiff's appellants are the prevailing parties in this case. The standard for injunctive relief under the All Writs Act, Your Honor. May I ask just a principle that would, it seems to me, doom to some extent your claim here, is if we were to hold that an order of the sort that you're relying on here had to unambiguously communicate that it was in fact on the merits, because I don't think you can tease that out from the four corners of the order we have before us. That is probably why we're all here on appeal, is that the order itself . . . So yeah, let me just finish my question. So why shouldn't we adopt the bright-line rule that just says, with this sort of, I don't know what you want to call it, a state put injunction, whatever label you want to attach to it, but in this posture, unless the order itself unambiguously states that it is on the merits, then we're not going to read that into it. Why shouldn't we adopt that principle? Because I think most other circuits have. Well, Your Honor, I believe that this Court's precedents don't support that reading, but the reason not to do it is the reason why we have fee-shifting statutes at all. We want people to act as private attorneys general. And in this case, there was a race-based and a viewpoint-restricted election. And the value of having that sort of fee-shifting statute is based on that. But in terms of why we shouldn't adopt the unambiguous standard used in other circuits, in this circuit, the case that is most on point is the Watson case. In Watson, there was an injunction under the sliding-scale standard at the District Court. In other words, the merits were as weak as they could be. There were serious questions going to the merits. The case was subsequently mooted, and that was a basic . . . I think in that case, though, didn't we have some indication from the District Court that it was, in fact, evaluating the plaintiff's likelihood of success on the merits? There was written text as to its evaluation of likelihood of success on the merits. Right. So in that kind of injunctive order, then, right, there's no problem. And that's what I recall from higher taste. We were dealing with injunctive orders in which there was an explicit discussion of the plaintiff's likelihood of success. There was some statement by the Court that I think the plaintiffs are likely to succeed, or there's something about the merits of the claims that hold to weight, whereas this kind of order is completely silent as to that. And I don't . . . I am frankly . . . maybe you can take another run at it. I don't see why we shouldn't adopt the rule that the other circuits have, because it seems to me you'd have to read a lot into this particular order to assume that, in fact, the Supreme Court agreed with the legal propositions you were advocating. Well, Your Honor, I don't think if we look at the cases from the other circuit that that's correct with all respect. Webster v. Souter indicated that you need to have a nuanced look at the circumstances surrounding an order to determine what the merits might be. And one of the cases, I believe it was a case that will come to me shortly in which we do discuss in the briefs, indicated that where . . . I'm sorry, Your Honor, because I've stumped on the name, I've stumped on the point, but . . . Yeah. Well, I'm just saying, isn't there a pretty easy way to read the context here as involving the Supreme Court just saying, listen, just hold everything. The election can proceed. Everything can go forward as planned, except just don't count the votes, don't declare any winners just yet, because we want the Ninth Circuit to finish its merits review on the preliminary injunction appeal. We're not communicating anything about who's likely to win, who's likely to lose. We're just saying, pause everything, and we'll let the circuit sort it out. That's how, I guess, if I had to guess as to what was in the minds of our Supreme Court colleagues, I would assume that's what they were thinking, not that they had made some merits-based determination that you . . . that your clients were likely to succeed necessarily. And so, that's what I'm saying. In this posture, I would be inclined to say, I'm not going to just assume, as you would like us to, that in fact they had deliberated about the merits and issued some pronouncement on that. I would assume the opposite, unless they tell us otherwise. That just seems to me the sounder rule, and I . . . Your Honor, if I may answer. Yeah. In Select Milk, that was the case I was trying to recall. It's a Fifth Circuit case. I'm sorry, D.C. Circuit case. In Select Milk, they said that it's not important to have some formalistic definition of what is a status quo injunction or where the status quo is. And look at what happened here. This injunction, both the Justice Kennedy's injunction and the Supreme Court's injunction, occurred when there was voting left to happen. Those injunctions . . . Yes, Your Honor, but are they status quo injunctions? I think the status quo was terribly interrupted. People knew that if they cast votes in those elections, they may never be counted. Now, what the Supreme Court has held in Dunn v. McNabb, which is the 28J case that I sent to the Court and the parties, in that case, the Court held that it was an abuse of discretion for a district court not to make a finding on the preliminary injunction standard of likelihood of success. And that went up under the All Reds Act. Let's assume, arguendo, in your response to my colleague, that we could somehow characterize what the Supreme Court did here as at least a merits-based decision. Yes, Your Honor. Aren't we still stuck with the catalyst theory under Buchanan? I mean, clearly, the defendants in this case got the message. They changed what they were going to do. They didn't count the votes. Basically, the whole thing just disappeared gradually. But it disappeared because of, I assume, the actions of the United States Supreme Court. Doesn't that fit exactly into what Buchanan was talking about? No, Your Honor, it doesn't. Okay, why not? The reason is that the Buchanan type of catalyst case is where the defendant alters their behavior based on the fact that the complaint was filed at all. Well, but this is a result. This is a result of the complaint that was filed, and it went very quickly. They were, as I understand it, literally in the process of voting, that people were coming to a convention or something like that. And because of this action by the Supreme Court, initially Justice Kennedy and then the whole court, they basically folded the tent and did all the other things that you've adequately described in your brief. But isn't that a direct result of what happened at the Supreme Court? So in other words, it was a catalyst. It moved them to do these things. Isn't that a correct view of it? With all respect, Your Honor, no. Okay. If that were true, if the theory Your Honor was expounding were true, then higher taste wouldn't have been decided at all. Well, that's what we're wondering about. Well, for a catalyst theory, it needs to be the case itself that in a general way caused the defendant to take some action. This is like the Dearmore case out of the Fifth Circuit where 12 days after an ordinance was amended. Do you think, again, that only . . . it's the literal filing of a complaint and that alone is what causes it in order to qualify under Buchanan? Is that what you're saying? Well, Your Honor, whether that hypothetical case is true or not, in this case they directly referred to what the Supreme Court did in all their press releases. They said, given the fact that it has done this, we're going to stop this case. Now, they didn't say, it's because we believe that in fact the plaintiff's case has merit and we wish we'd never done this. They didn't say that. They never say that, but . . . Exactly. The reality is they acted as a result of what the Supreme Court did, right? Yes, Your Honor. You claim that it occurred because there was a merits-based decision and they knew they had lost and so they ended their quest, but you could also argue that the Supreme Court didn't decide it on the merits. It was like my colleague described, where they simply were saying, like, just keep things as they are. Don't count anything. Let's go forward from there, but they took the action that the Supreme Court had undertaken as a sign that this was the end. They weren't going to do any more. They weren't going to be successful in their quest. Well, Your Honor, that's the same as it was in Watson. I mean, that's the same as it was in Williams v. Saliotto, where an injunction is issued and actions are taken on account of that injunction. There's no mind-reading necessary here. In other words, they stated why they took these actions. Where that's the case, it's on account of the judicial action, and if the case is subsequently mooted, of course, you're never going to find out how the case would have turned out, what the judgment would have been on the merits, but you still are deemed a prevailing party under higher taste, Williams and Watson. And, Your Honor, it's important to note in this case that because they did issue their injunction in the midst of an ongoing election, effectively spoiling that election, there's no way to ever know with a week remaining how it could have turned out. Because they issued their injunction like that, not only is it not a status quo injunction, it indicates that they didn't rule on the equities, because in those cases, there's such strong case law cited by appellees that where you are inspired or you move based to enjoin an ongoing election, the equities are all against you. The election was not enjoined, though. That's where I think you're sort of overstating your case. I am, Your Honor. What I should have said is interference with an ongoing election. That's the... I don't even think that's an accurate description, right? Because the election process could have, it did, in fact, sort of run its course. It didn't, Your Honor. It did in the sense that all the votes that were to be cast were cast. They were never counted. I grant you that. But that's why I say, I view the Supreme Court as just saying, just set them aside. The kinds of sort of equitable harm that would be inflicted by actually counting the votes, announcing the winners, and then have the Ninth Circuit later declare the whole election unlawful would be extremely problematic. So just set them secretly, sort through the legal questions, and then we'll know. With all respect, Your Honor, that's not what happened. The Supreme Court issued its injunction on December 2. By that time, the appellees had already extended voting by 21 days. That's December 2, it issued its injunction. On December 15, the appellees said, we're not holding the election, and added, by the way, that now the case is moved, which certainly implies that we won, but they added that. And so there was a week to go in, regardless of whether you can read their minds like that, there was a week to go in the election. I'm trying to get straight the facts, because you obviously know them better than I do. I thought that the initial election for the, was it the delegates to the convention, that did run its course. No, Your Honor. Okay, why didn't that run its course? The initial period of voting. People were stopped from voting? It didn't run its course because ultimately on December 15, the election was canceled with a week to go. It wasn't canceled by the Supreme Court. It was canceled by action of the defendants. They said, we're abandoning this on December 15, and they said in their papers to the Supreme Court, this is the Office of Hawaiian Affairs papers, on the contempt motion, they said, because we stopped it in the middle, we will never know the results. This is not a matter of counting it one day. Okay, so there was more time, that's what I was trying to get straight, there was more time still for people to cast votes. Seven days. Got it, okay. All right, Your Honor, if I may reserve my time. Sure. Good morning. Good morning, Your Honors. Miyoko Peretzoledo on behalf of Apeli Natiapuni. Plaintiffs' appellants have lost at every stage of the proceedings, except when they sought that one time an emergency temporary injunction to the Supreme Court pending their appeal to the Ninth Circuit. It's important to note that they did not obtain a single favorable ruling that they were likely to succeed on the merits of their claims, nor did they obtain a final judgment on the merits of their claims. Yet, they contend they're the prevailing parties and entitled to attorney's fees and costs under Section 1988, based purely on the Supreme Court's 5-4 procedural decision pending the Ninth Circuit. Counsel, with respect, didn't they get, in quotes, some of the benefit that they sought? If you look at the language of higher taste, in order to reach the conclusion that... That's what Jensen is, I recall it. Oh, I'm sorry. I think that's from Jensen. Okay, from Jensen, some of the benefit that they received. It's important to do a comparison of what relief they sought in the complaint and what the Supreme Court's emergency order stated. Forgive me. As I understand it, what they were trying to do was to stop an election. It didn't. They went to the Supreme Court, the Supreme Court took the action it did, and stopped it. Now, you can say, well, you stopped it, not they stopped it, and we need to know why you did that, but didn't, in effect, they stop it. Let's say they had never filed with the Supreme Court. Nothing. They'd lost it every step before. You'd have gone forward with the election, would you not? Yes, and the election did go forward, even after the emergency order. Okay, and did you then do anything with the results of the election? Were they published? Because the emergency order had specifically enjoined counting the ballots cast in the final disposition of the Ninth Circuit appeal. No, that did not happen. In this particular case, you took the position, I think, that it was mooted at that point, so there was no need for further litigation, but it just all died. And I guess that's what I'm struggling with, is that what they were trying to do was to stop the election. That was a benefit they wanted. It did stop it. Now, you could say, well, they didn't do it the regular way because they didn't get an injunction before, but if the Supreme Court had not acted in the way that it did, you would have gone forward and they would have lost everything. Why didn't they win some of the benefit? Respectfully, what they sought in the complaint was a declaratory judgment that the voting restrictions and qualifications violated their rights, and they also sought injunctive relief. Now, that injunctive relief was specific to those restrictions. Hold on one second. Did we give her all of her time? It looks like we're almost counting down from the other... Your Honor... Oh, you're dividing up. Oh, never mind. Five minutes. Okay, I apologize. Five minutes remaining. I didn't know about the split. My apologies. I should have made that clear. Go ahead. Apart from the declaratory judgment relief that they sought, they sought injunctive relief. That injunctive relief focused specifically on the restrictions and qualifications for the role. Now, the role was used to determine eligible voters, and as a requirement for that role, people had to affirm three declarations. Now, that is the heart of their complaint and the relief that they sought. If we look at what happened after the emergency order, Na'i Apuni continued to use the role. Eligible voters from the low continued to cast their votes. Specifically, the plaintiffs, Make, Kal, Kent, and Mitsui, unless they actually affirmed the declarations on the role, they were not allowed to vote, and plaintiffs Kapero and Moniz were not automatically removed from the role absent any other further action after the emergency order. That's the specific relief that the plaintiffs sought in their complaint. Let's just say, you're right, they specifically sought A, B, C, but the big thing they were looking for was D, which was to stop the election. If they didn't get A, B, and C, but they stopped the election, had the result of stopping the election by getting the Supreme Court to act, is that enough to show that they got, in quotes, some of the benefit under Jensen? No, it is not. Why? I think there's a conflation of what the relief sought in the complaint and what the lawsuit was about. Na'i Apuni's goal was to facilitate and help a path toward self-determination or self-governance efforts for Native Hawaiians. That did not limit, that was not limited to just an election. That included, the election was a means to get delegates to an aha, or a convening, where then those delegates could work on a self-governing document. And that happened. That was a success. So the mootness aspect was not necessarily that they obtained or delayed the counting or certification of votes cast in the private election. I know you're out of time, I just want to ask you this one question. What did your clients retain that can go forward in some future way, as a result of what happened in this particular election? What did they gain? They have a governing document, they were able to bring together people who could discuss, organize, and propose a path for Native Hawaiian self-governance. They have the use of the role, which can still be used. And that's what was challenged. And moreover, with regard to any future election, all Hawai'i residents are still not allowed to participate in any election that might certify or ratify the document that emanated from the aha. And are they state actors? No, Your Honor. There was no finding of state action by the Supreme Court or any court in this matter. Did the state provide any money to help do any of this? Yes, Your Honor. The state did, through OHA, provide state monies, but at the preliminary injunction hearing, plaintiffs conceded that that was not enough to find state action. And that binds us? No, but that's not an issue before this court for this particular... If there weren't public actors, then all of this doesn't hurt anybody, right? Because private parties can do whatever they want to. Correct. The question is whether you're a public actor. And you're saying that action by the trial court was enough to solve that question. Is that right? That's correct, Your Honor. Interesting. Okay. Do you have other questions? Alright, let's hear from the second. Are all of you speaking? Yes, sir. I'm excited. Go ahead. Good morning. Good morning, Your Honors. May it please the Court. Kurt Klein on behalf of the Office of Hawaiian Affairs, appellees, who I'll refer to as OHA from here on out. OHA's limited involvement in this case was, in this dispute, stems from its provision of ceded lands trust fund revenue to Na'i Aupuni in support of an election, a convention, or AHA, and a ratification of governing documents possibly created out of the AHA. Other than providing the support, however, OHA had no involvement in Na'i Aupuni's decision making. And that was a critical point in the district court's proceedings. Why is it important? Without the money provided by OHA, could they have gone forward? Realistically, would they have had the resources to move forward with the election in the first place? Your Honor, respectfully, and as code counsel stated, the determination of whether or not there was state action is not an issue before this court. Well, it is to me. Because if this is not state action, then I don't even know why we're here. I agree with you, Your Honor. Do you stipulate that this was state action? No, I do not stipulate. Okay, well then why are we here if it's not state action? Well, we're here, Your Honor, because it was a private election that was challenged by appellants to be a public election in which infringed their constitutional rights. We have a clear holding from the United States District Court here by Judge Seabright ruling that there was no state action. And that binds us, right? Yes, Your Honor. Well, if that's the case, if Judge Seabright is correct and it binds us in some way, then what's this all about? Some private people got together and decided to hold an election. It's like a homeowners association, right? Exactly, Your Honor. So what's the problem? Why are we here? Your Honor, respectfully, you may dismiss the appeal. And the moving party in the District Court is not entitled to their fees and costs because this is a private election. There was no state action. More importantly, Your Honor, Judge Seabright asked opposing counsel about Watson and about higher taste. Those cases all involved preliminary injunctions before the District Court, where the District Court granted preliminary injunctive relief, made a merits determination. That never occurred in favor of plaintiffs in this case. So you say that Judge Seabright made a merits determination, that he's a wonderful judge, fine judge, but he's a District Court judge. Yes, Your Honor. Was that decision about whether this was state action ever appealed to our court? It was appealed, Your Honor. Okay, and what did our court say? The District Court's, I'm sorry, appellants appealed the District Court's ruling to the Ninth Circuit Court of Appeals in requesting an emergency relief. This court denied that relief. Appellants then sought emergency injunctive relief before the United States Supreme Court. Ultimately, the court did issue an injunction. That issue, as Honorable Judge Watford said, was merely a status quo order. It preserved the status quo. But was not the whole point of that that it wasn't clear whether this was a state act or not? If they had said this is a homeowner's association, the court would have never even touched it, would it? They wouldn't even have provided a status quo decision. Your Honor, there was no determination by the United States Supreme Court about whether or not there was state action. There was merely an identification by the Supreme Court that there may be constitutional rights at issue. With respect, the only way there would have been constitutional issues is if there were state action, right? Correct, but there was no finding of state action. I understand that, but the Supreme Court, as my colleague has pointed out, said, you know, this is status quo. Just stop. Let the courts rule, let the Ninth Circuit rule, and so on. But if there had not been the possibility that there was state action, would the Supreme Court have rolled on anything? It might have been dismissed. Maybe so, but they didn't do that, did they? The standard, though, under higher taste, is whether or not there is a judicial impriatur in order to merit... Well, the impriatur is a decision, basically, and they said, hold up, hold up. Arguably, that's a judicial impriatur. I guess what I'm struggling with is, if this is a homeowner's association, we've got no case on their part, nothing, zero. On the other hand, if there is some basis for a state action, you've got money from the state, then you've got a big problem, potentially, right? Potentially, and that's why the United States Supreme Court, Your Honor, handed back down to this court in order for a determination on the merits about whether or not the district court in Honolulu accurately found that there was no state action. But then you said it's moot. It's done, it's over, we're not doing anything further. Well, importantly, Your Honor, yes, Your Honor, the action was deemed moot, but importantly, when that decision, when that injunction was entered by the Supreme Court, it only prevented the counting of ballots and certifying winners to an election. It did not cancel the election, Your Honor. I understand that, but you said, nonetheless, when it came back, you said, this whole thing is moot, nothing to talk about, nothing to see here, right? Your Honor, it was only moot because because Ngai Iao Puni purposely canceled the election, right? Which was challenged, Your Honor. The appellants filed a motion for contempt saying, look, you violated the U.S. Supreme Court's order, right? The High Court said, no, there was no violation for canceling that election. My colleague have any questions? All right, thank you. Bachelorette number three will now come to the podium. Good morning, Your Honors. May it please the Court. My name is Robert Nakatsugi, and I'm a Deputy Attorney General for the State of Hawaii, and I represent Governor David Ige, the Commissioners of the Native Hawaiian Rule Commission, and the Executive Director of the Commission. Collectively, I will refer to my clients as the State Defendants, and the State Defendants agree with Ngai Iao Puni and the OHA Defendants on the question of whether plaintiffs are a prevailing party. It's our position that they are not a prevailing party. I do want to address some additional arguments that the State Defendants have. First of all, Your Honor, even if this Court rules in favor of plaintiffs on the prevailing party issue, there are serious procedural problems with this case. Plaintiff's attorney's fees motion was procedurally defective. The Supreme Court order in this case that plaintiffs rely on, it's essentially an injunction pending appeal. And because of that, the plaintiffs should have filed their attorney's fees motion in this Court in the Ninth Circuit after the first Ninth Circuit appeal based on Circuit Rule 39-1.6. The first decision in this case came out August 29, 2016. They had 28 days to file their fees motion in this Court. They did not do that. They also did not ask for permission to transfer the fees issue to the District Court, which they could have done. They didn't do either. And because of that, Your Honor... How many days? 28 days, Your Honor. 14 days to file a motion for rehearing and then 14 additional days to file the fees motion. They didn't do either. They should have done it in this Court because, as I mentioned, what they essentially obtained from the Supreme Court was a stay pending appeal. This was pending the Ninth Circuit appeal. The Ninth Circuit appeal was pending at that time. So your position is even if they got what they pretend that they got, or say that they got, because they didn't follow the timing of our rule, they in effect forfeited their right to get attorney fees. Is that correct? Yes, Your Honor. They could not obtain attorney fees. There's a case on this, Cummings v. Connell. They should have filed their motion. They did not do so. So procedurally, their motion was defective. That's the end of the story from your perspective. All the rest of this is humbug. Well, Your Honor, I would say that this is an argument that this Court could use in order to rule in favor of affirming the District Court. I do realize that this Court might want to address the stay put status quo order issue because that is unsettled in the Ninth Circuit. A large number of plaintiffs of appeals have, in fact, ruled on that issue, and this would be an opportunity for the Court to clarify Ninth Circuit law on that. But, if this Court wants to affirm on some other grounds, this Court can. I would argue that regardless of what the Court does on the stay put order, this Court can also find that the plaintiff's motion was procedurally defective and affirm the District Court but on alternate grounds. Now, Your Honor, plaintiffs in their reply brief rely on a case called Yamada v. Snipes to argue that they should be able to file the fees motion in the District Court. Respectfully, Yamada v. Snipes is distinguishable. In Yamada v. Snipes, the problem was that the case had to be remanded back to the District Court to determine the prevailing party. This case is different because their prevailing party argument is based on, one, the Supreme Court's order and, two, the mootness of the election issue. Both of those issues were resolved in the Ninth Circuit. So, they could have, and they should have filed their motion in the Ninth Circuit. They didn't do so. I thought that we would want parties to file motions for attorney's fees in the first instance in our Court only when they were seeking fees on appeal alone. Here, though, the plaintiffs, I thought, were seeking fees for all of the work they had done on the entire case, which would obviously involve a lot of proceedings in the District Court. I'm just speaking for myself. I don't want to be bothered with motions that seek a bunch of fees that people incurred in the District Court. I would have no way of sorting through how to rule on that. So, why wouldn't we want, for efficiency's sake, when somebody is seeking fees for the entire course of the case, both in the District Court and on appeal, to file it in the District Court and let the District Court be the first decider? Well, Your Honor, this Court could have done that, but he had to ask to transfer it to the District Court first, and they didn't do that. So, under the Circuit rules, they had to ask, and because they never asked . . . I'm not aware of any rule that requires a party to seek . . . to file a motion for attorney's fees in our Court to recover fees that they incurred in District Court proceedings. Are you saying that . . . Well, Your Honor, they're asking for both, actually. They're asking for . . . That's my point, right. And the rule you're invoking is, when somebody is seeking fees on appeal, I understand that, and then you're right. We have the discretion to say, you know what, this is kind of messy. There are unresolved factual issues. Let's remand it to the District Court. But I'm not aware of any rule that says, again, when a party is seeking fees for the entire case, that they must first file the motion in our Court. Your Honor, in this case, as my colleagues have mentioned, the defendants prevailed at every other step. Really, the only success that they had was the Supreme Court's order. And that occurred on appeal. So, because this case . . . because of the unusual posture of this case, I think it would have been appropriate, and in fact, based on the circuit rules, they should have filed their fees request in this Court. Or, they could have asked to transfer it to District Court, which they never did. Now, Your Honor . . . I think you've used your time up. Thank you. Thank you all for that. So, you have some rebuttal time, Counsel. Your Honor . . . In the complaint, in paragraph . . . page 32, paragraph 3 of the Prayer for Relief, we asked for preliminary and permanent relief in joining the use of the role and the calling, holding, or certifying of any election. So, we did obtain substantial significant, at least significant, relief. And speaking from a practical point of view, they plan to hold an election for delegates, a convention, a ratification vote. They only had a convention, and those weren't elected delegates. And, Your Honor, don't lose sight of the fact that because they were not elected, this case cannot be used to satisfy the Department of the Interior's regulations to allow it to administratively declare what would effectively be a tribe or a Native governing entity. So, we achieved most of the relief we sought as a practical matter. We also achieved relief that we had identified in the complaint. Now, Your Honor, to the extent that we're concerned about whether they're state actors, that's like relitigating the case. But if they're not state actors, if they're the Kiwanis Club, then there was no reason for the Supreme Court to issue its injunction. And that's sort of . . . Do we just intuit that? I mean, it is the whole case, really, as we talked about. It's not the Kiwanis Club. It's not a Homeowners Association. How did the Supreme Court get involved at all if it didn't at least worry this was a state action? Your Honor, the word intuit troubles me, but yes, that's what we must do. It must have decided . . . Isn't that what we have to do if we believe what your opponents suggest? Pardon me? Isn't that what we have to do if we're going to believe . . . well, it could be either one of your theories at this point. Well, Your Honor, if the Supreme Court decided that they were not state actors, it's frankly inconceivable, it's illogical that they would have issued an injunction. If this was a private election, they can do whatever they want. The whole point, the argument that we had made, and that's another point I want to make to Your Honors. Everyone concedes in their papers that the hearing at the district court level was detailed and explored the issues succinctly. And 426 pages of record went up on what was basically an issue of law. There were few or no disputes of fact. So, the Supreme Court had the time, and it also had an injunction in place. And 21 more days. It had time to consider this issue carefully. Under the Supreme Court precedent saying that you abuse your discretion if you're a district court and you don't argue the merits on an All Writs Act injunction that goes up, you need to make that argument. If it's a preponderance of the evidence for an injunction and it has to be indisputably clear at the Supreme Court level, we at least had serious questions going to the merits, which was enough for Watson. Remind me what you said about the, I guess is it what, two of the orders we have from the Supreme Court where the court explicitly said in this posture we're not saying anything about the merits. One was College and Little Sisters. We have five cases where they just talk about the merits. In the two cases, the only two cases where they don't, what they say is, here they comment on the fact that we're not commenting on the merits. And in those cases, it was about But nonetheless granted the same kind of relief, right? So that's why it sort of undercut your position that no matter what, the court must always say something about the merits in order to grant this relief. So I just, what did you, what was your response? Well, Your Honor, we, it wasn't that the Supreme Court couldn't do that, although I think there's a decent argument that that decision has been overruled by Dunn versus McNabb, that they would no longer do that. Regardless, they're the Supreme Court and if they chose to do it, they would probably do it. But in that case, they sent it back to the parties to settle. And that's why they said, surely you can accommodate the religious exercise under the Affordable Care Act without us ruling on this. There were seven cases, I believe, in front of them at the time on this issue. That situation, it was really one situation, two cases, but that situation was unique. And that's why we say when they talk about the merits, they just talk about the merits. They don't say, now we're going to do this in an unusual exercise of our authority. All right. I think your time is up. We thank all the counselors. You've done a very nice job. Each of you can take pride in your action. We give you a bad time. You know that. But that's because we're trying to understand your position, try to make it work. But we appreciate the excellence of your presentation and your brief. Thank you all. We'll decide this case in due course. Case is submitted.
judges: Graber, M. Smith, Watford